IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs August 2, 2016

## STATE OF TENNESSEE v. DANTARIO BURGESS, RODRIGUEZ MCNARY and JOSEPH JONES-CAGE

**Appeal from the Criminal Court for Shelby County
No. 14-02782 J. Robert Carter, Jr., Judge**

_____

**No. W2015-00588-CCA-R3-CD  -  Filed January 31, 2017**

_____

**AND**

## DANTARIO BURGESS v. STATE OF TENNESSEE[1]

**Appeal from the Criminal Court for Shelby County
No. 14-02782          J. Robert Carter, Jr., Judge**

_____

**No. W2015-02398-CCA-R3-ECN**

_____

A Shelby County jury convicted the Defendants, Dantario Burgess, Rodriguez McNary, and Joseph Jones-Cage, of two counts of attempted first degree murder, one count of aggravated assault, and one count of reckless endangerment. Mr. Jones-Cage and Mr. McNary also were convicted of employing a firearm during the commission of a dangerous felony. Mr. Burgess also was convicted of employing a firearm during the commission of a dangerous felony having been previously convicted of a felony and of possessing a firearm after having been convicted of a felony involving the use or attempted use of violence. The trial court sentenced Mr. Burgess to an effective term of fifty-five years, Mr. Jones-Cage to an effective term of fifty years, and Mr. McNary to an effective term of forty-one years. On appeal, the Defendants raise the following issues either collectively or individually: (1) the trial court erred in denying Mr. Burgess'

---

[1] While the direct appeal in Case No. W2015-00588-CCA-R3-CD was pending in this court, Mr. Burgess filed a pro se petition for writ of error coram nobis. The trial court denied the petition, and Mr. Burgess filed a pro se notice of appeal. Mr. Burgess did not file a motion in this court seeking to stay his appeal while the petition for writ of error coram nobis was pending in the trial court in accordance with *State v. Mixon*, 983 S.W.2d 661, 672 (Tenn. 1999). Nevertheless, we consolidate Mr. Burgess' direct appeal with his appeal of the denial of coram nobis relief. *See Mixon*, 983 S.W.2d at 672.

motion to suppress a witness's identification of him in a photographic lineup and in limiting the cross-examination of the victim during the suppression hearing; (2) the failure to name the predicate felony in the indictment for employing a firearm during the commission of a dangerous felony voids the conviction; (3) the evidence is insufficient to support the convictions; (4) the trial court committed plain error in not allowing defense counsel to impeach the victim's testimony at trial with her statement to the police; (5) the malfunctioning of the recording equipment during the trial warranted a mistrial; (6) the sentences of Mr. Burgess and Mr. McNary are excessive; (7) the cumulative effect of the errors warrants a new trial; and (8) the trial court erred in denying Mr. Burgess' pro se petition for writ of error coram nobis. We conclude that the evidence is insufficient to support Mr. McNary's conviction for employing a firearm during the commission of a dangerous felony and reverse the conviction. We remand the matter for a new trial on possession of a firearm during the commission of a dangerous felony as a lesser-included offense. We also remand the case for entry of corrected judgments reflecting that Mr. Jones-Cage was convicted of attempted first degree murder in count one and is to serve 100 percent of his sentence for the firearm conviction in count three. We otherwise affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed in Part, Reversed in Part, and Remanded**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN and ROBERT L. HOLLOWAY, JR., JJ., joined.

Paul K. Guibao (on appeal) and Jada Brisentine (at trial), Memphis, Tennessee, and Dantario Burgess, pro se (coram nobis proceedings), Mountain City, Tennessee, for the appellant, Dantario Burgess.

Charles W. Gilchrist, Jr., Memphis, Tennessee, for the appellant, Rodriquez McNary.

Stephen C. Bush, District Public Defender; Tony N. Brayton (on appeal) and Alicia Kutch (at trial), Assistant District Public Defenders, for the appellant, Joseph Jones-Cage.

Herbert H. Slatery III, Attorney General and Reporter; Renee W. Turner, Senior Counsel; Jeffrey D. Zentner, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Paul Hagerman and Meghan Fowler, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

## FACTUAL AND PROCEDURAL HISTORY

The evidence presented at trial established that on March 10, 2013, the Defendants and co-defendant Benjamin Bohannon shot at a group of people at an apartment complex and then fled in Mr. Jones-Cage's vehicle. The group included Mr. Demarcus Thomas, Ms. Shanna Niter, Ms. Niter's two year-old son J.N.,[2] Ms. Brittany Hervery, and Ms. Hervery's two-month-old daughter J.H. Mr. Thomas sustained multiple gunshot wounds to the face and head. He survived the shooting but requires twenty-four-hour care as a result of the injuries. Ms. Niter sustained a graze gunshot wound to her right side.

### The State's Proof

Ms. Shanna Niter testified that on March 10, 2013, at approximately 10:30 or 11:00 a.m., Mr. Thomas was at her apartment at the Hillview Apartments cooking for her, J.N., and her daughter, who was a few months old. Mr. Thomas burned bacon, and as a result, Ms. Niter opened the windows and doors to the apartment. J.N. ran outside in his underwear, and Ms. Niter chased after him.

Ms. Niter stated that she saw Mr. Jones-Cage or "Trey" in a Ford Explorer parked outside of her apartment and that he called out to her. The vehicle was parked so that the passenger side of the vehicle was facing Ms. Niter and the front of the vehicle was facing a dumpster. Ms. Niter said that as she approached the vehicle, she had a strange feeling and the "hairs on the back of [her] neck stood up." She stated that Mr. Jones-Cage was sitting in the driver's seat and that three other men, whom she had never met, were inside the vehicle. The front window on the passenger side was down, and the backseat window on the passenger side was halfway down. Ms. Niter said that she could see each of the men inside of the vehicle and that the men looked at her as if they did not want her to approach them. She stated that she did not walk all the way up to the truck.

At trial, Ms. Niter identified Mr. Burgess as the man who was sitting on the back passenger side and Mr. McNary as the man who was sitting on the back driver's side of the vehicle. Ms. Niter said the man who was sitting on the front passenger side was not at the trial.

Ms. Niter testified that Mr. Jones-Cage asked her where her cousin, "Little Glen," was and told her to call "his b**** a**." Ms. Niter told Mr. Jones-Cage that "Little Glen" was not there and that she was unable to contact him. At that time, J.N. was standing next to Ms. Niter; Mr. Thomas was standing on steps on the opposite side of Ms. Niter; and Ms. Hervery was standing nearby and holding her baby who was in a car seat.

---

[2] It is the policy of this court to refer to minor victims by their initials.

Ms. Niter stated that Mr. Thomas told Mr. Jones-Cage and the other men to leave because children were in the area. Mr. Jones-Cage stated, "[F]*** them b****** and their kids." Ms. Niter said that Mr. Jones-Cage then "upped" a small black gun and that he and the passengers began shooting. She saw Mr. Jones-Cage, Mr. Burgess, and the man in the front passenger seat shooting. She saw Mr. McNary with a gun but was not sure whether he was shooting. The man in the front passenger seat was hanging out of the window and shooting, while Mr. Jones-Cage was leaning and shooting from the driver's seat out of the front passenger window. Ms. Niter said that from "the way that [Mr. Jones-Cage] was shooting[,] he could [have] shot the person . . . sitting next to him." Mr. Burgess was shooting a large black gun out of the back passenger side window.

Ms. Niter described the shootings as "like a war." She said one of the bullets hit Mr. Thomas in the face and that "stuff smashed everywhere." Mr. Thomas turned around, and another bullet hit him in the back of his head and knocked him down. Ms. Hervery dropped her baby, who was in a carseat, and began running back and forth while screaming. Ms. Niter said she was in shock and was unable to move. She heard bullets hitting the bricks behind her. She then grabbed her son and began running. During the shooting, Ms. Niter's baby was sitting in a highchair inside her apartment. Ms. Niter later discovered that bullets had entered the apartment and struck the highchair.

Ms. Niter testified that a bullet struck her on the right side near her rib cage. The bullet knocked several layers of skin away from the area, and Ms. Niter had a scar as a result of the injury. She later had a tattoo placed over the scar and said that she could still feel "fragments or something in there."

Ms. Niter stated that when the police arrived, Mr. Thomas was lying on the ground and "fighting for his life." His eyeball was no longer in its socket, and his nose was gone. When Mr. Thomas tried to breathe, blood shot out from the area where his nose had been.

Ms. Niter received medical attention and gave officers a description of the vehicle involved. She later gave a statement to the police, identified Mr. Jones-Cage, and gave a brief description of the passengers. She later identified the Defendants and the front seat passenger in photographic lineups.

On cross-examination, Ms. Niter testified that she called Mr. Jones-Cage earlier in the day. She explained that "Little Glen" made a comment about Mr. Jones-Cage on Facebook and that Mr. Jones-Cage told "Little Glen" to have Ms. Niter bring him to Mr. Jones-Cage's house so that Mr. Jones-Cage could "f*** him up." Ms. Niter stated that Mr. Jones-Cage had been pursuing "Little Glen" for two years.

- 4 -

Ms. Niter acknowledged that while she identified Mr. Jones-Cage on the day of the shooting, she did not identify the passengers until a later date. She did not remember whether she told the police that one of the men had a tattoo on his face and did not recall testifying at the preliminary hearing that she never told the police that one of the men had a scar or an identifying mark between his eyes. Ms. Niter acknowledged that Mr. Burgess had a "very noticeable" identifying mark between his eyes. She said the back passenger window to the vehicle was tinted and was only rolled halfway down.

Ms. Brittany Hervery testified that on April 10, 2013, she and her two-month-old daughter, J.H., went to Ms. Niter's apartment because Ms. Hervery was planning to cook breakfast for Ms. Niter, Ms. Niter's two children, and Mr. Thomas. After Ms. Hervery arrived, a green four-door truck driven by Mr. Jones-Cage pulled up. Ms. Hervery said she had known Mr. Jones-Cage for a few years. She saw three other people inside the vehicle. Mr. Jones-Cage asked Ms. Niter, "Where's Little Glen, b**** a**?" Ms. Niter told Mr. Jones-Cage that "Little Glen" was not there, and Mr. Jones-Cage instructed Ms. Niter to call him. Ms. Niter told him to wait and began walking away from the vehicle.

Ms. Hervery stated that Mr. Thomas came outside after hearing the commotion and asked Ms. Hervery what was occurring. Ms. Hervery told him that the men were looking for "Little Glen." Mr. Thomas told the men to leave because children were outside. Ms. Hervery said Mr. Thomas did not threaten the men. She also said that many children were outside and that she was holding her baby. Mr. Jones-Cage replied, "[F]*** you, those kids and them b******," and he and some of the passengers began shooting.

Ms. Hervery testified that the passenger in the front seat was shooting but was not looking as he shot. Mr. Jones-Cage was reaching over the passenger and shooting out of the window. Ms. Hervery said the man who was sitting in the backseat on the passenger's side was leaning out of the car and shooting with a large gun. She did not see the man sitting behind Mr. Jones-Cage shooting and did not get a good look at him.

Mr. Thomas was shot between the eyes and in the temple. Upon hearing the shots, Ms. Hervery dropped her baby and crawled to Mr. Thomas to assist him. Someone picked up Ms. Hervery's baby and carried her inside an apartment. Ms. Hervery got on top of Mr. Thomas; the shooting stopped; and the men drove away. Ms. Hervery then called 911. She said that Mr. Thomas's eye was on the ground, that his nose was "opened up," and that his blood was "spewing" everywhere. Ms. Hervery and the children were not injured.

When the police officers arrived, Ms. Hervery told them what had occurred. The officers later showed Ms. Hervery photographic lineups. She identified Mr. Jones-Cage from the photographic lineup but was unable to identify the other defendants.

On cross-examination, Ms. Hervery testified that the back windows to Mr. Jones-Cage's vehicle were tinted and that she did not see everyone clearly until the windows were rolled down. She was unsure how far down the windows were rolled. She told officers on the day of the shooting that she only saw Mr. Jones-Cage. An officer later called her and asked whether she was certain about the information provided in her statement. Ms. Hervery told the officer that one other person had a tattoo on his face. She stated at trial that the man with the tattoo also was shooting from the vehicle.

Ms. Felita Caraway testified that in April 2013, she lived at the Hillview Apartments on the second floor of a building that was separate from the building where Ms. Niter's apartment was located. On April 10, 2013, she was inside her apartment when she heard noises that sounded like firecrackers. She walked into her kitchen, opened a cabinet door, shut the door, and then entered her living room. A bullet then came through her kitchen window and traveled through the cabinet door that she had just closed, through her bathroom, and into her bedroom. Ms. Caraway went outside and saw the damage to her apartment and Mr. Thomas lying three steps away. Ms. Hervery was trying to help Mr. Thomas.

Ms. Catrice Gordon lived on the first floor in the same apartment building as Ms. Caraway and across from the building where Ms. Niter lived. On April 10, 2013, she was outside with her three-year-old son and two-year-old daughter and saw Ms. Niter and Ms. Hervery. Ms. Gordon testified that at some point, she took her daughter inside because her daughter wanted to watch television. Her son remained outside playing with Ms. Niter's son.

Ms. Gordon stated that she was standing in her kitchen when she heard gunfire. She ran to the front door because her son was still outside. She said it sounded like a "war" outside. Ms. Gordon's son was at the front door telling her that people were shooting, and Ms. Niter was asking her for help and to get her son. Ms. Gordon retrieved J.N. and ran back inside of her apartment. She said the shooting had stopped when she went outside, and she saw blood all around Mr. Thomas.

Ms. Leslie Davis, Mr. Thomas's mother, testified that Mr. Thomas sustained multiple gunshot wounds to his head. One bullet remained in his head, and his doctors informed her that any surgery to remove the bullet could result in additional damage. He cannot walk or move his right arm. He has limited movement of his left arm, is somewhat limited in his speech, suffered memory loss, and is somewhat "slower." He is

a permanent resident in a rehabilitation facility, is bedridden and blind, and requires twenty-four-hour care.

Ms. Davis said that on the day of the shooting, her sister called her and informed her that Mr. Thomas had been shot multiple times and had been transported to the Regional Medical Center. Ms. Davis's sister then called her again and told her that part of Mr. Thomas's face had been shot off, and Ms. Davis fainted. Ms. Davis went to the Regional Medical Center and was allowed to see Mr. Thomas after a few hours. She said that Mr. Thomas's head and face were wrapped in gauze and that his head was "enormous." Mr. Thomas remained in the trauma unit of the hospital for two months. Ms. Davis said she did not work during that time because she never knew whether Mr. Thomas would live.

Multiple surgeries were performed on Mr. Thomas's head to alleviate the swelling in his brain, and he has a permanent shunt in his head. Ms. Davis said that Mr. Thomas had a hole in the bridge of his nose that was approximately the size of a quarter. Doctors removed the cartilage from Mr. Thomas's nose. Ms. Davis stated that the hole in Mr. Thomas's nose was so deep that she could see his tonsils. Mr. Thomas's jawbone and facial bones were shattered, and doctors had to wire his mouth shut and reconstruct his jawbone. Ms. Davis said two different doctors advised her to place Mr. Thomas in hospice care but that she refused.

After two months at the Regional Medical Center, Mr. Thomas was transferred to an extended care program and then to another facility. He was on a ventilator and unresponsive for months. He also required a feeding tube and lost a large amount of weight as a result. Ms. Davis said that while Mr. Thomas no longer requires a ventilator or a feeding tube, he is totally dependent on someone to care for him and will remain that way for the rest of his life.

Officer Michael Gaines of the Memphis Police Department testified that he and five other officers with the Airways Precinct Task Force responded to the scene of the shooting. Upon his arrival, he saw a very large crowd of women and children in the parking lot and an African American man lying in a drainage ditch between two apartment buildings. The man was still alive, but the area of the top of his eyebrows to the bottom of his nose was gone. Officer Gaines could see inside the man's skull. Officer Dan Chambers placed pressure on the man's wound. When the man breathed out, blood squirted out from the wound, over Officer Gaines's head, and onto his uniform.

After an ambulance arrived, the officers spoke to witnesses and surveyed the area. Officer Gaines observed a large amount of shell casings littering the parking lot. He stated that the casings were 7.62 by 39 millimeter casings, which are commonly used in

AK-47, AK-74, and SKS style assault weapons. He explained that such rifles are designed for combat and that their bullets can travel through walls and automobiles. He stated that semiautomatic handguns and assault rifles eject casings when shot but that revolvers do not.

Officer Gaines observed a second or third story apartment that appeared to have been struck by gunfire. He entered the apartment and found that the bullet had penetrated walls and was lying by the bed in a bedroom. He said the bullet was the type fired by an assault rifle.

Officer Gaines stated that approximately thirty minutes to an hour after leaving the scene, he received a call that a vehicle matching the description of the vehicle involved in the shooting had been located four to five miles away from the apartment complex. The green Ford Explorer was parked toward the back of a house that appeared to be vacant on Leflore Street. Officer Gaines said the hood of the vehicle was still warm from recent use.

Officer Gaines testified that the sergeant who was in charge of the case advised him and other officers that Mr. Jones-Cage had been developed as a suspect and that his residence also was located on Leflore Street. Officer Gaines and other officers went to Mr. Jones-Cage's address five or six times over the course of multiple days, but they never found him and were never allowed to search his house. Family members advised the officers that they did not know where Mr. Jones-Cage was.

On cross-examination, Officer Gaines testified that a woman on the scene of the shooting sustained a "graze strike" or a minor abrasion. He believed that the woman was treated on the scene by the fire department.

Officer Gaines acknowledged that he did not find a weapon at the scene of the shooting. He said revolvers and single-shot pistols are the only two firearms of which he was aware that did not eject casings. Rather, the shooter must physically remove the casings and reload the firearm. Officer Gaines stated that some handguns with magazines eject casings when shot. He also stated that while 7.62 by 39 millimeter bullets are predominately used in "battle rifles," there are hundreds of rifles that can shoot multiple calibers of bullets.

Officer Newton Morgan, a crime scene investigator with the Memphis Police Department, testified that he collected sixteen shell casings and one bullet fragment from the scene. The bullet fragment was found on the bed inside of an apartment where he also observed bullet holes in the walls.

Special Agent Cervinia Braswell, a forensic scientist with the firearms identification unit of the Tennessee Bureau of Investigation, was accepted by the trial court as an expert in forensic firearms identification. She examined sixteen 7.62 by 39 millimeter rifle cartridge casings, which she said were generally used in "AKA or AK-47 and SKS type firearms." Special Agent Braswell determined that all sixteen cartridge casings had been fired from the same firearm.

Special Agent Braswell also examined a bullet fragment and measured its lands and groves. She entered the date into the General Rifling Characteristic Database, which is a database compiled by the Federal Bureau of Investigation that generated a list of firearms from which the bullet could have been fired. She said the measurements of the bullet fragment were consistent with 7.62 by 39 millimeter bullets. She determined that the same caliber firearm could have shot the casings and the bullet fragment. On cross-examination, Special Agent Braswell acknowledged that she was unable to conclude that the bullet and the casings were fired from the same firearm.

Officer David Payment with the crime scene investigation unit of the Memphis Police Department testified that he processed the green Ford Explorer and lifted fingerprints from the right rear exterior window on the passenger side of the vehicle. Officer Payment did not find any gunshot residue, shell casings, or bullets inside of the vehicle. He acknowledged that the lack of gunshot residue could indicate that the vehicle had been wiped down.

On cross-examination, Officer Payment testified that the lack of gunshot residue in a vehicle following a shooting was not unusual. He said the presence of gunshot residue is dependent upon factors such as whether the vehicle was moving at the time of the shooting, whether the windows were down, and whether the weapons were fired outside of the vehicle. Officer Payment stated that he would expect to find gunshot residue in the vehicle if the driver was shooting out of the passenger window. He also stated that if an assault weapon is fired outside the window of a vehicle, he would expect to see gunshot residue from the breech, which is located close to the trigger. He acknowledged that the residue would blow away if the vehicle was moving.

Officer Payment stated that three fingerprints were lifted from the right rear passenger window and that one fingerprint was lifted from the front passenger window. He found papers and miscellaneous items inside of the vehicle.

Officer Robert Winston, a latent print examiner for the crime scene investigation unit of the Memphis Police Department, was accepted by the trial court as an expert in latent fingerprint examination. He determined that the fingerprints lifted from the green Ford Explorer belonged to Benjamin Bohannon.

Officer Shawn Hicks with the Memphis Police Department testified that Ms. Niter identified Mr. McNary, Mr. Burgess, and Mr. Bohannon in photographic lineups on April 23, 2013. Mr. Burgess was later brought to the police department as a suspect. He was advised of his rights, waived his rights, and agreed to speak to officers. Mr. Burgess said that while he knew Mr. Jones-Cage, he did not socialize with him on a regular basis. Officer Hicks said that Mr. Burgess initially denied that he had ever been inside Mr. Jones-Cage's Ford Explorer. Mr. Burgess later admitted that he had been inside the vehicle but denied that he was in the vehicle during the shooting. Mr. Burgess stated that while he knew Mr. Bohannon, they were not close friends. When Officer Hicks confronted Mr. Burgess with photographs on Instagram of Mr. Burgess and Mr. Bohannon together, Mr. Burgess stated that the photographs did not mean that they were good friends.

On cross-examination, Officer Hicks testified that Ms. Hervery was not able to identify Mr. Burgess in a photographic lineup.

Sergeant Donald Adams with the Memphis Police Department testified that Ms. Niter identified Mr. Jones-Cage in a photographic lineup on April 10, 2013. Sergeant Adams interviewed Mr. Jones-Cage on April 22, following his arrest. Sergeant Adams advised Mr. Jones-Cage of his rights, and Mr. Jones-Cage waived his rights and agreed to speak to the officers. Mr. Jones-Cage's attorney, Kendra Tidwell, was present when he gave a statement.

Sergeant Adams stated that Mr. Jones-Cage admitted that he and three other men went to the apartment complex on April 10, 2013, in a green Ford Explorer to search for "Little Glen." Mr. Jones-Cage said that the other men fired twenty to thirty shots, but that he did not fire any shots. He also said they fled the scene and hid the firearms in the trunk of a Ford Crown Victoria. He stated that when the police officers located his vehicle, he hid in an abandoned house and that the others jumped over a fence and ran.

Mr. Jones-Cage stated that a few days prior to the shooting, April Niter posted a comment about him on Facebook, and "Little Glen" responded that Mr. Jones-Cage "was going to f*** [her] off." Mr. Jones-Cage sent a message to "Little Glen" calling him "a little dusty TV stealing dude" and stating that he was the only person assisting April Niter when she had issues with her car. Mr. Jones-Cage said that on the morning prior to the shooting, he was assisting April Niter in her efforts to repair her car when he saw that Shanna Niter had called him. He asked April Niter why Shanna Niter called him, and April Niter stated that she wanted to talk to him about his message to "Little Glen." Mr. Jones-Cage called Shanna Niter several times, but she did not answer. He also sent her a text message.

Mr. Jones-Cage stated that when he returned home, "[a]nother guy"[3] was there. Mr. Jones-Cage told the man that he planned to go to the Hillview Apartments to "holler" at "Little Glen." The man did not want Mr. Jones-Cage to go there alone and agreed to go with Mr. Jones-Cage. Mr. Jones-Cage said that they drove "into the west side drive" and that the man got out of the car and began talking to someone. The man returned to Mr. Jones-Cage's car and said that no one there knew "Little Glen." When they were leaving the parking long, Mr. Jones-Cage saw three men, two of whom he knew. The men approached Mr. Jones-Cage and the other man and "did their handshakes." The man who was in the car with Mr. Jones-Cage asked the group whether they knew "Little Glen," and the men responded that "they don't f***" with the Hillview residents.

Mr. Jones-Cage told the officers that two of the men entered the backseat of his vehicle while holding a black bag. Mr. Jones-Cage then drove to the parking lot in front of Shanna Niter's apartment. Mr. Jones-Cage described the shooting as follows:

> I hollered out, where Little Glen? Shanna came out and said hold on, let me call him. She walked off and I pulled up and made a U-turn around the median and was facing west.
>
> A gentleman walked up the steps with his shirt off smoking a cigarette. Then Shanna started yelling wait. Then the guy with no shirt started yelling some words. The last thing I heard him say was that y'all need to go. As soon as I started to pull off one of the other guys in my car started shooting. I sped away. On the ride home they kept saying I need to keep it one hundred.
>
> I parked my truck and recovered the gun. One of the other guys put the bag with the gun in the trunk of a white Crown Vic. I went into the house and talked to April for a second and I got a call from another guy who said my truck was involved in a shooting…. I was about to move it but he said the police were about to pull up.
>
> The police zoomed down on the truck and I was hiding in the neighbor's vacant home while the police was over there. The other guys had jumped the gate and ran on Orleans when the police got there.

Sergeant Adams testified that Mr. Jones-Cage stated that the men grabbed the black bag from the bushes and that he did not ask them what was in the bag. Mr. Jones-Cage said he did not ask the shooter why he started shooting because Mr. Jones-Cage was

---

[3] Mr. Jones-Cage's statement that was presented at trial was redacted to exclude the names of his co-defendants. *See Bruton v. United States*, 391 U.S. 123 (1968) (prohibiting the use of incriminating statements made by a non-testifying co-defendant against another defendant).

afraid and shocked. Mr. Jones-Cage told the officer that to "keep it one hundred" meant that he better not report them.

Sergeant Adams said Mr. Jones-Cage signed his written statement. Sergeant Adams explained that he did not confront Mr. Jones-Cage with the facts of the case because his attorney was present. Rather, Sergeant Adams only asked Mr. Jones-Cage what occurred and documented his responses. Sergeant Adams stated that the Ford Explorer recovered by the police was registered to Mr. Jones-Cage's father.

On cross-examination, Sergeant Adams testified that he spoke to Ms. Niter at the scene and that Ms. Niter said she was injured. He did not recall seeing any blood on Ms. Niter other than her own blood and said Ms. Niter did not have any wounds on her face. Officers did not recover any firearms used in the shooting.

Mr. Toney Sanders, the principal court clerk at the Shelby County Criminal Court Clerk's Office, testified that on July 3, 2014, Mr. Bohannon appeared for a scheduled court date and was given another court date of August 4, 2014. Mr. Bohannon failed to appear in court on August 4. As a result, his bond was forfeited, and an arrest warrant was issued. Mr. Bohannon had not been located. The arrest warrant was still active at the time of trial.

Mr. Sanders testified that Mr. Burgess had a court date on October 8, 2014, which was rescheduled for October 10. On October 10, his case was reset to November 24, 2014.

Ms. Juaquatta Harris with the Shelby County Sheriff's Office presented a recording of a telephone call made by Mr. Burgess from the jail on October 11, 2014. During the call, Mr. Burgess spoke to a man who identified himself as "Benjamin" about Benjamin's "no show." Benjamin mentioned the case, and Mr. Burgess stopped him and stated that the call was being recorded. Mr. Burgess then stated that he was scheduled to return to court in forty-five days and that once the matter was resolved, Benjamin could "go in" and then be released.

The State and Mr. Burgess' counsel stipulated that Mr. Burgess had a prior felony conviction that satisfied an element of the crime of convicted felon in the possession of a firearm.

**The Defendants' Proof**

Officer Shonda Harris of the Memphis Police Department testified that she spoke to Ms. Niter at the scene of the shooting and that Ms. Niter provided her with a

photograph of Mr. Jones-Cage. Officer Harris said she did not use the photograph in the investigation or as part of the photographic lineup.

Mr. Jones-Cage testified that on Monday, April 8, 2013, Ms. April Niter, his former girlfriend, posted a comment about him on Facebook. Glen Hervery, Jr., "Little Glen," responded to the post that he had told her that Mr. Jones-Cage "was going to f*** [her] off." Later that day, Mr. Jones-Cage and Ms. April Niter reconciled. Mr. Jones-Cage detailed April Niter's automobile issues on Tuesday night and Wednesday morning and his efforts to assist her. At approximately 4:30 a.m. on the Wednesday morning of the shooting, Mr. Jones-Cage sent Mr. Hervery a message over Facebook about Mr. Hervery's comment. Later that morning, Mr. Jones-Cage received a call from Ms. Shanna Niter, but she did not answer when he returned her call. Mr. Jones-Cage learned from Ms. April Niter that Ms. Shanna Niter called him about the message he sent to Mr. Hervery. Mr. Jones-Cage and Mr. Hervery exchanged messages over Facebook. Mr. Jones-Cage wrote to Mr. Hervery to come to his home that he would show Mr. Hervery "what the f****** you off is." Mr. Hervery sent Mr. Jones-Cage a message that he was at the Hillview Apartments, and Mr. Jones-Cage responded that he was on his way there.

Mr. Jones-Cage testified that he drove to the apartment complex to search for Mr. Hervery by himself. While driving around, Mr. Jones-Cage saw Ms. Shanna Niter. He said she was "mugging" him because they had a "falling out" approximately two weeks prior. He stated he also saw Mr. Thomas outside the apartment shooting dice. Mr. Jones-Cage testified that Ms. Niter said that she would call Mr. Hervery and that Mr. Thomas then approached his vehicle and said Mr. Hervery was not there. Mr. Jones-Cage maintained that as he was leaving, he heard gunshots coming from behind him and drove away as quickly as possible. He said he did not see Mr. Thomas get shot. Mr. Jones-Cage stated that Ms. Niter called him and said that she was going to tell the police that he did the shooting and send him to jail just as she had done with her former boyfriend.

Mr. Jones-Cage testified that he parked his vehicle on Leflore Street at the home of his father's girlfriend and walked home. He said he later received a call from Ms. Shanna Niter, who stated that the police were on their way to his house. Mr. Jones-Cage hid in a vacant house located down the street from his home. He acknowledged "going on the run" and avoiding the police.

Mr. Jones-Cage later contacted an attorney and gave a statement to the police. He maintained that he was untruthful in his statement to the police. He denied that Mr. McNary, Mr. Bohannon, and Mr. Burgess were present during the shooting and denied that he had any weapons in his vehicle at the time of the shooting. Mr. Jones-Cage explained the presence of Mr. Bohannon's fingerprints by stating that Mr. Bohannon was with a friend of his brother and was likely in Mr. Jones-Cage's vehicle on the night

before the shooting. Mr. Jones-Cage further explained that he was mad at Mr. McNary, Mr. Bohannon, and Mr. Burgess because he believed that they were involved in the theft of his music equipment while he was eluding police. Mr. Jones-Cage said he told Ms. April Niter to instruct Ms. Shanna Niter to tell the police that the three co-defendants were involved.

On cross-examination by Mr. Burgess' counsel, Mr. Jones-Cage testified that he wrote a letter to Mr. Burgess stating that if Mr. Burgess had not stolen the property, Mr. Burgess would not have been involved in the court proceedings.

On cross-examination by the State, Mr. Jones-Cage acknowledged that the jury did not hear his entire statement to the police and that portions of his statement were redacted. He said he was mad at "Little Glen" when he drove to Hillview Apartments. Mr. Jones-Cage agreed that he told the police officers that prior to going to the apartment complex, he went home where he was met by his cousin, Mr. McNary, who stated that he would not allow Mr. Jones-Cage to go to the apartment complex alone.

Mr. Jones-Cage acknowledged telling the police officers that when he and Mr. McNary arrived at the apartment complex, they saw Mr. Burgess and Mr. Bohannon and that Mr. Burgess and Mr. Bohannon retrieved a black bag that contained an assault rifle from the bushes and got into Mr. Jones-Cage's green Ford Explorer. Mr. Jones-Cages told the police officers that he drove up to the area of Ms. Niter's apartment and asked her about "Little Glen." Mr. Jones-Cage told the officers that when Mr. Thomas told them to leave, Mr. Burgess began shooting an assault rifle twenty to thirty times and that they fled the scene. Mr. Jones-Cage told the officers that he parked his vehicle beside a vacant house and hid in a vacant house while the other men fled.

Mr. Jones-Cage testified that he drove alone to the apartment complex to address an ongoing issue with Mr. Hervery. While Mr. Jones-Cage said that he owned a gun and had a permit, he denied possessing the gun while at the apartment complex. He denied that Ms. Hervery was at the apartment complex. He said he saw Mr. Thomas gambling with other men and maintained that someone shot Mr. Thomas over a game of dice. Mr. Jones-Cage denied wiping down his vehicle and said that his fingerprints should have been on the vehicle.

Mr. Jones-Cage stated that after the shooting, he worked for the next two nights. He then rode on a bus to Atlanta, Georgia, and said he knew that the police were searching for him.

Ms. Ada Sherrod, Mr. Burgess' grandmother, testified that she recalled April 10, 2013, because she had minor surgery on Friday, April 12. She said that prior to her

surgery, she was suffering from seizures and blackouts and that someone was required to stay with her as a result. She stated that Mr. Burgess cared for her in the mornings until her daughter returned from work at 2:30 p.m. Ms. Sherrod testified that on April 10, Mr. Burgess was sitting on her front porch when she awoke and that he assisted her in cooking breakfast. She said Mr. Burgess was still at her home at noon that day.

Ms. Joyce Aldridge, Mr. Burgess' mother, testified that in April 2013, her mother needed someone to stay with her because she was suffering from seizures and blackouts. Ms. Aldridge said Mr. Burgess stayed with Ms. Sherrod in the mornings while Ms. Aldridge was at work. Ms. Aldridge stated that she saw Mr. Burgess when she returned home from work during the evening of April 10, 2013. She said that Mr. Burgess was not acting unusual or anxious and that all of the chores had been completed.

At the conclusion of the trial, the jury convicted the Defendants of two counts of attempted first degree murder, one count of aggravated assault, and one count of reckless endangerment. The jury convicted Mr. Jones-Cage and Mr. McNary of employing a firearm during the commission of a dangerous felony. The jury also convicted Mr. Burgess of employing a firearm during the commission of a dangerous felony having been previously convicted of a felony and of possessing a firearm after having been convicted of a felony involving the use or attempted use of violence.

A bifurcated hearing was held on the issue whether Mr. Burgess had a prior qualifying felony conviction that enhanced his conviction for employing a firearm during the commission of a dangerous felony. During the hearing, Mr. Burgess stipulated that he had a prior felony conviction that qualified under the statute in that he pled guilty to attempted second degree murder on May 17, 2007. The jury returned a verdict finding that Mr. Burgess had a prior qualifying felony conviction.

The trial court then held a sentencing hearing after which the trial court sentenced Mr. Burgess to an effective term of fifty-five years, Mr. Jones-Cage to an effective term of fifty years, and Mr. McNary to an effective term of forty-one years. This appeal followed.

## ANALYSIS

On appeal, the Defendants raise the following issues either collectively or individually: (1) the trial court erred in denying Mr. Burgess' motion to suppress a witness's identification of him in a photographic lineup and in limiting the cross-examination of Ms. Niter during the suppression hearing; (2) the failure to name the predicate felony in the indictment for employing a firearm during the commission of a dangerous felony voids the conviction; (3) the evidence is insufficient to support the

convictions; (4) the trial court committed plain error in not allowing defense counsel to impeach the victim's testimony at trial with her statement to the police; (5) the malfunctioning of the recording equipment during the trial warranted a mistrial; (6) the sentences of Mr. Burgess and Mr. McNary are excessive; (7) the cumulative effect of the errors warrants a new trial; and (8) the trial court erred in denying Mr. Burgess' pro se petition for writ of error coram nobis.

## I. SUPPRESSION OF PRETRIAL IDENTIFICATION

Mr. Burgess contends that the trial court erred by refusing to allow him to utilize a transcript of a preliminary hearing to impeach a witness during the suppression hearing and in denying his motion to suppress a witness's identification of him in a photographic lineup.

### A. Evidence at the Suppression Hearing

Prior to trial, Mr. Burgess filed a "Motion to Suppress Photographic Identification and In-Court Identifications," a "Motion to Suppress Identification Testimony," and a memorandum of law in support of his motions. Mr. Burgess argued that the identification procedure was prejudicial and unduly suggestive in that his photograph in the lineup was not similar to the other photographs and that officers informed Ms. Shanna Niter of new evidence prior to her identification of Mr. Burgess in the photographic lineup. Mr. Burgess also argued that Ms. Niter's testimony regarding the identification was untrustworthy and unreliable and lacked "the requisite personal knowledge that is crucial in an identification witness."

During the suppression hearing, Ms. Niter testified that she knew Mr. Jones-Cage prior to the shooting. Following the shooting, she told the police officers that Mr. Jones-Cage was involved and identified him in a photographic lineup.

Ms. Niter stated that she did not know the other men who were in the vehicle with Mr. Jones-Cage and had never seen them prior to the day of the shooting. She said that the windows of Mr. Jones-Cage's vehicle were rolled halfway down and that she could see the individuals inside the vehicle. She stated that she remembered the faces of the men.

Ms. Niter testified that she continued to call the police officers after the shooting and ask whether they had arrested Mr. Jones-Cage. An officer later contacted her and asked her to view additional photographic lineups. Ms. Niter said the officer showed her multiple photographic lineups and asked her whether she knew anyone in the lineups. The officer instructed her to circle the faces of those with whom she was familiar and to not be concerned if she did not recognize anyone. Mr. Niter stated that the officer told

her that the occupants of the vehicle may or may not be in the photographic lineups. She also stated that the officer never indicated to her the identity of the suspects or told her that they had suspects in custody.

Prior to viewing the photographic lineups, Ms. Niter was provided with written instructions, which she stated that she read and understood. The instructions stated that "[d]uring the interview process, no one is to give me any hints or suggestions or attempt to influence my identification in any way." The instructions also stated that "[t]here's no significance to the orders in which the photos will appear" and that "I am not to assume that the guilty party must be one of the persons represented." Ms. Niter said that no one attempted to influence her identification of those in the photographic lineups and that she did not feel that she was required to choose someone from the lineups. She stated that no one told her that the other occupants in Mr. Jones-Cage's vehicle would be in the photographic lineups. Rather, she said she identified the men because they were with Mr. Jones-Cage during the shooting. She stated that she did not know the names of the other occupants at the time of the shooting and that she still did not know their names at the time of the suppression hearing. She maintained that she knew the faces of the occupants and where they were sitting inside the vehicle.

Ms. Niter identified Mr. Burgess in a photographic lineup as "the backseat rider" who possessed "the big gun." She said she identified Mr. Burgess in the lineup because he was in the backseat of Mr. Jones-Cage's vehicle and not because the background of his photograph was dark. Ms. Niter identified Mr. Burgess as an occupant of Mr. Jones-Cage's car during both the preliminary hearing and the suppression hearing.

Ms. Niter testified that Mr. Jones-Cage wrote a letter threatening her if she came to court. She said Mr. Jones-Cage did not tell her the identities of the other three occupants of his vehicle or who to identify in the photographic lineup or during the preliminary hearing. Ms. Niter was aware that Mr. Jones-Cage gave a statement to the police, but she did not know who he identified as participating in the shooting.

On cross-examination, Ms. Niter testified that following the shooting, she provided the police officers with information regarding Mr. Jones-Cage's involvement. She believed that she only told the officers that the other occupants were males and that she did not provide a physical description or distinguishing marks on the other occupants.

Defense counsel for Mr. Burgess began questioning Ms. Niter about her testimony at the preliminary hearing. Ms. Niter acknowledged that she stated at the preliminary hearing that windows in the backseat of the vehicle were rolled down halfway. Defense counsel asked Ms. Niter whether she testified at the preliminary hearing that one of the people in the backseat was "peeking as if he did not want to be seen." Ms. Niter

responded that the man was looking at her as if he did not want her to walk up to vehicle. Defense counsel then began asking Ms. Niter about her specific testimony at the preliminary hearing. After the State's lodged multiple objections to the form of defense counsel's questions and the trial court sustained the objections, the following colloquy occurred:

Q      (By [defense counsel]) And you stated the window of the back passenger seat was halfway down. You stated that. Correct?

A      Yes, I did.

Q      You're stating that the windows were tinted. Is that correct?

A      The back windows were.

Q      And you stated he really didn't want to be seen at the hearing. Is that correct?

A      I don't recall that.

Q      You don't recall stating that at the preliminary hearing?

A      No, I don't.

[Defense Counsel]: Your Honor, should I refresh her memory on the –

THE COURT: If you think that that is significant, you can pass the document up. Do you have a certified copy or is this your transcription of it or what?

. . . .

[Defense Counsel]: This is a transcript I believe I received from the public defender's office.

THE COURT: Well, and—and you're willing to state that that's a true and accurate transcript of these proceedings?

[Defense Counsel]: I've reviewed the tape, Your Honor. It appears to be a true and accurate –

- 18 -

THE COURT: So you want to now testify in this matter. I'm sorry. You're—if it were more material in this, I would maybe would—but you're asking her and now you're trying to refresh her recollection with a document that she's never seen so I mean I—you know I think you've established that the windows were halfway down, the rear windows were tinted. At some point she testified today that the person was looking at her like he didn't want her walking up there but so you can go on from there.

[Defense Counsel]: I'll move on, Your Honor. Thank you.

THE COURT: All of this has to do potentially so far with the weight that a jury might give this identification. Nothing so far has gotten to admissibility issues and so I'm going to let you move on and see where we get with that.

Ms. Niter testified that she did not recall stating during the preliminary hearing that an officer contacted her and told her that he had new information about the case. She said the officer told her that "they had a few people in the lineup for me to pick out." Ms. Niter then testified, "I don't think that's exactly how he said it. I'm just saying he said that they had a few people in the lineup, some people that they wanted me to look and see if their faces looked familiar to pick out in the lineup."

Ms. Niter acknowledged that Mr. Burgess had a distinguishing scar located at the top of the bridge of his nose and in between his eyebrows. Ms. Niter could not recall whether she mentioned the scar to the officers prior to identifying him in a photographic lineup.

Sergeant Shawn Hicks with the Memphis Police Department testified that he prepared the photographic lineup that included a photograph of Mr. Burgess by using a computer program called Mugshots. The program has access to the database of mugshots taken when inmates are brought into the Shelby County Jail. The program uses the mugshot of a suspect to find five mugshots of those with similar characteristics.

Sergeant Hicks testified that Mr. Burgess had a star tattooed on his forehead. Sergeant Hicks said the computer program was unable to locate five other mugshots of people with star tattoos on their forehead. As a result, Sergeant Hicks had to look at the photographs suggested by the computer program to locate those who had similar tattoos located in similar positions. Sergeant Hicks stated that he attempted to prepare a lineup whereby the photograph of Mr. Burgess did not "stick out" among the other photographs.

Sergeant Hicks stated that he reviewed the form of advice to witnesses who are viewing photographic lineups. Sergeant Hicks said the form explained that while the officers have identified a person who they suspect may have been involved in the incident, the witness viewing the lineup cannot assume that the suspect or some other person who may be involved is included in the lineup. The form also stated that the officers could not provide hints or influence the witness in any way. Sergeant Hicks stated that Ms. Niter indicated that she understood this information. He said Ms. Niter viewed multiple photographic lineups and identified three people, including Mr. Burgess. Sergeant Hicks denied that he attempted to influence Ms. Niter's decision and said he had little knowledge about the shooting.

On cross-examination, Sergeant Hicks testified that in creating the photographic lineup, he attempted to include photographs of men who had features similar to those of Mr. Burgess. He found photographs of men who had tattoos on their foreheads but was unable to locate anyone who had the exact same tattoo as Mr. Burgess. Sergeant Hicks noted that each photograph in the lineup had different lighting in the background. He acknowledged that the background in Mr. Burgess' photograph appeared to be darker that the backgrounds in the other photographs. Sergeant Hicks did not believe that he contacted Ms. Niter to ask her to come to the police station for the purpose of viewing the lineups.

At the conclusion of the proof, defense counsel requested that the recording of the preliminary hearing be entered as an exhibit. The State objected on the basis that the recording had not been authenticated. The trial court agreed to give defense counsel leave to present a witness to authenticate the recording. The trial court allowed defense counsel to present an argument as if the recording had been entered into evidence. There is nothing in the record indicating that defense counsel later presented a witness to authenticate the recording of the preliminary hearing, and the recording was never entered as an exhibit.

At the conclusion of the hearing, the trial court noted that much of the evidence presented during the hearing related to the weight of the identification and not to its admissibility. With regard to the photographic lineup, the trial court stated that "it would be nice" if everyone's photograph had the same background and "if we had other people who had stars on their forehead." The trial court believed that the officer "did a good job" in utilizing the computer program and "getting people with other marks and things on their faces." The trial court found that the photographic lineup was not unduly suggestive and credited Ms. Niter's testimony that she selected Mr. Burgess' photograph based upon her memory of the individual who was sitting in the backseat of the car.

The trial court found that while the better practice would be to have a witness come to the police station without providing a reason, instructing a witness to come to the police station without hinting as to the reason would be difficult. The trial court credited Ms. Niter's testimony that she maintained regular contact with the police over the course of the investigation for a variety of reasons, including whether Mr. Jones-Cage had been placed in custody, and that she was asked to come to the police station. The trial court noted that Ms. Niter testified that the officers wanted her to view lineups to determine whether she could identify anyone and that the evidence established that Ms. Niter was informed that the suspects may or may not have been included in the lineups. The trial court found that Ms. Niter "unequivocally" testified that she chose Mr. Burgess' photograph from the lineup because she recognized him as being involved in the shooting.

The trial court concluded that identification in the photographic lineup did not violate Mr. Burgess' constitutional rights. The trial court also concluded that the subsequent in-court identification was not tainted by the identification in the photographic lineup. Therefore, the trial court denied Mr. Burgess' motion.

## B. Photographic Lineup

A trial court's factual findings made during a motion to suppress are binding on an appellate court unless the evidence preponderates against them. *State v. Saylor*, 117 S.W.3d 239, 244 (Tenn. 2003). Determinations of witness credibility and the resolution of conflicts in the evidence are left to the trial court. *State v. Riels*, 216 S.W.3d 737, 753 (Tenn. 2007). An appellate court may consider testimony presented at trial in reviewing the trial court's conclusions in a motion to suppress evidence. *Id.* The prevailing party is entitled to the strongest legitimate view of the evidence and to all reasonable inferences drawn from the evidence. *State v. Day*, 263 S.W.3d 891, 900 (Tenn. 2008). A trial court's conclusions of law are reviewed de novo. *State v. Sawyer*, 156 S.W.3d 531, 533 (Tenn. 2005). Likewise, a trial court's application of law to the facts is reviewed de novo. *State v. Walton*, 41 S.W.3d 75, 81 (Tenn. 2001).

The United States Supreme Court has recognized that "convictions based on eyewitness identification at trial following a pretrial photographic identification will be set aside only if the photographic identification was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons v. United States*, 390 U.S. 377, 384 (1968). The risk of an incorrect identification is greater if the eyewitness is shown a lineup where a single photograph "is in some way emphasized." *Id.* at 383. The risk of misidentification also increases "if the police indicate to the witness that they have other evidence that one of the persons pictured committed the crime." *Id.* "When a defendant argues that a lineup is suggestive based on

differences between the subjects of the lineup, this court has required that the subjects be 'grossly dissimilar' before it will find that the lineup is impermissibly suggestive." *State v. Albert W. Bentley*, No. M2010-01882-CCA-R3-CD, 2011 WL 6916762, at *5 (Tenn. Crim. App. Dec. 29, 2011) (citing *State v. Edwards*, 868 S.W.2d 682, 694 (Tenn. Crim. App. 1993)).

The United States Supreme Court has established a two-part analysis which the trial court must apply in determining the validity of a pre-trial identification. *Neil v. Biggers*, 409 U.S. 188, 198-99 (1972). First, the trial court must determine whether the identification procedure was unduly suggestive. *Id.* at 198. If the trial court determines that the identification procedure was unduly suggestive, the court must then consider whether the identification procedure was reliable under the totality of the circumstances. *Id.* at 199. Five factors to be considered in making that determination include:

> the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.

*Id.* at 199-200. If the trial court determines that the identification procedure was not unduly suggestive, the court need not apply the totality of the circumstances test. *See State v. Butler*, 795 S.W.2d 680, 686 (Tenn. Crim. App. 1990).

Mr. Burgess asserts that the photographic lineup and the overall identification process were unduly suggestive. He maintains that his photograph stood out in the lineup because he had a star tattoo on his face and the background of his photograph was darker than the other photographs in the lineup. We have reviewed the original lineup of the six photographs from which Ms. Niter made her identification. Five of the six subjects have clear tattoos or markings on their foreheads. All of the subjects appear to be of the same age, have similar hairstyles, and have facial hair. None of the subjects were wearing distinctive clothing. Although the background of Mr. Burgess' photograph and that of another subject appear darker than the backgrounds of the remaining photographs, the background of two other photographs appear more gray, and the background of two other photographs appear more tan. The background color does not draw attention to Mr. Burgess' photograph. The trial court properly concluded that the subjects were not "grossly dissimilar" as to render the lineup impermissibly suggestive.

We also agree with the trial court's finding that the manner of the identification process was not unduly suggestive. Mr. Burgess argues that the police officer's call to Ms. Niter during which the officer requested that Ms. Niter come to the station to view

- 22 -

the photographic lineups "give[s] the strong impression to the lay person that someone in the pictures had committed a crime."  While Ms. Niter initially testified that the officer told her that "they had a few people in the lineup for me to pick out," she clarified, "I don't think that's exactly how he said it.  I'm just saying he said that they had a few people in the lineup, some people that they wanted me to look and see if their faces looked familiar to pick out in the lineup."  We conclude that this conversation would not give a lay person the impression that someone in the lineup was involved in the shooting. Rather, Ms. Niter was told that the photograph of one of the perpetrators may be included in the lineup and that she should select a subject only if she was certain that the subject was one of the perpetrators.  Sergeant Hicks reviewed the identification procedures with Ms. Niter before showing her the lineup, and both Sergeant Hicks and Ms. Niter stated that she understood the procedures.  Neither the officers nor anyone else suggested to Ms. Niter which photograph to select.  The evidence established that the identification procedure was not unduly suggestive.  Because we have determined that the identification process was not unduly suggestive, we need not assess the reliability of Ms. Niter's identification.  *See Butler*, 795 S.W.2d at 686.  The trial court properly denied Mr. Burgess' motion to suppress, and Mr. Burgess is not entitled to relief with regard to this issue.

### C.  Impeachment Evidence

Mr. Burgess contends that the trial court erred in not allowing defense counsel to use the transcript of the preliminary hearing to refresh Ms. Niter's recollection or impeach her testimony.  Mr. Burgess' briefing on this issue consists of one paragraph in which he provided little analysis and failed to cite to any authority to support his claim. *See* Tenn. R. App. P. 27(a)(7) (stating that an appellant's brief must contain an argument "setting forth...the contentions of the appellant with respect to the issues presented, and the reasons therefor, including the reasons why the contentions require appellate relief, with citations to the authorities and appropriate references to the record...relied on"); Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this Court.").

Mr. Burgess also failed to raise this issue in his motion for new trial.  *See* Tenn. R. App. P. 3(e) ("[N]o issue presented for review shall be predicated upon error in the admission or exclusion of evidence, jury instructions granted or refused, misconduct of jurors, parties or counsel, or other action committed or occurring during the trial of the case, or other ground upon which a new trial is sought, unless the same was specifically stated in a motion for a new trial; otherwise such issues will be treated as waived.").  Accordingly, this issue is waived, and we may only review it for plain error.  Tenn. R. App. P. 36(b) ("When necessary to do substantial justice, an appellate court may consider

an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal."). Five factors must be met before this court will conclude that plain error exists:

> "(a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is 'necessary to do substantial justice.'"

*State v. Smith*, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting *State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994). Our court has stated that plain error review will rarely extend to an evidentiary issue. *State v. Ricky E. Scoville*, No. M2006-01684-CCA-R3-CD, 2007 WL 2600540, at *2 (Tenn. Crim. App. Sept. 11, 2007).

During the suppression hearing, defense counsel questioned Ms. Niter on cross-examination regarding her testimony during the preliminary hearing. When Ms. Niter stated that she did not recall testifying during the hearing that Mr. Burgess appeared as if he did not wish to be seen while sitting in the backseat of Mr. Jones-Cage's vehicle prior to the shooting, defense counsel sought to refresh Ms. Niter's recollection with a transcript that defense counsel had received from the public defender's office and that had not been certified as an accurate reflection of the testimony presented during the preliminary hearing.

We conclude that Mr. Burgess has failed to establish that consideration of the error is necessary to do substantial justice. Testimony regarding Ms. Niter's opportunity to view Mr. Burgess was, at most, relevant to the reliability of Ms. Niter's identification of Mr. Burgess under the totality of the circumstances. *See Neil*, 409 U.S. at 199-200 (listing "the opportunity of the witness to view the criminal at the time of the crime" as a factor in determining whether the identification was reliable under the totality of the circumstances). As both the trial court and this court concluded, however, the photographic lineup and the identification procedure were not unduly suggestive. As a result, an analysis of the factors in *Neil v. Biggers* to determine the reliability of Ms. Niter's identification was not required, and any error in failing to allow Mr. Burgess to present additional testimony to support these factors was harmless. *See* Tenn. R. App. P. 36(b).

Moreover, Mr. Burgess failed to identify on appeal what portions of Ms. Niter's testimony were impeachable through the use of the transcript of the preliminary hearing. Finally, we note that the trial court granted Mr. Burgess the opportunity to return to court and to present a certified recording of the preliminary hearing to support his motion to

- 24 -

suppress.  Nothing in the record indicates that Mr. Burgess took advantage of this opportunity.  Accordingly, Mr. Burgess has failed to establish plain error and is not entitled to relief regarding this issue.

## II.  SUFFICIENCY OF THE INDICTMENT

Mr. McNary contends that the State's failure to name the predicate felony in count three of the indictment, employing a firearm during the commission of a dangerous felony, voids the charge.  The State maintains that Mr. McNary waived the issue because he raised the issue for the first time on appeal.  The State also maintains that the indictment provided Mr. McNary with sufficient notice.

The State correctly notes that Mr. McNary has raised this issue for the first time on appeal.  The failure to timely object or raise the issue in a motion for new trial generally results in waiver on appeal.  *See* Tenn. R. App. P. 3(e).  Our supreme court recently noted that

> Tennessee cases addressing whether an indictment affords a defendant adequate notice have referred to the issue as jurisdictional, implicating the subject matter jurisdiction of the trial court to adjudicate the charge.  If the matter is considered jurisdictional and it is determined that the indictment does not give proper notice to the defendant, then the indictment must be dismissed.

*State v. Willie Duncan*, No. W2013-02554-CCA-R3-CD, __ S.W.3d __, 2016 WL 6024007, at *8 n.10 (Tenn. 2016) (citations omitted).  In *United States v. Cotton*, the United States Supreme Court rejected the view that defects in an indictment are jurisdictional and held that a defective indictment does not deprive a trial court of jurisdiction.  535 U.S. 625, 629-31 (2002); *see Willie Duncan*, 2016 WL 6024007, at *8 n.10.  Our supreme court noted that since *Cotton*, "'[s]ome states continue to describe an indictment that fails to allege "each and every element of the offense" as importing a "jurisdictional defect that renders void ab initio" any subsequent conviction, notwithstanding the adequacy of the evidence produced at trial.'"  *Willie Duncan*, 2016 WL 6024007, at *8 n.10 (quoting Wayne LaFave, et al., 5 Crim. Proc. § 19.2(e) (4th ed. 2015)).  In recent years, however, "'a growing list of states has flatly rejected earlier rulings characterizing the failure to allege all material elements as a jurisdictional defect.'"  *Id.* (quoting Wayne LaFave, et al., 5 Crim. Proc. § 19.2(e) (4th ed. 2015)).  Our supreme court, however, did not reach the issue of whether defects in an indictment are jurisdictional because the issue was not raised or argued on appeal.  *Id.*  Regardless of whether Mr. McNary waived the issue, however, he is not entitled to relief.

- 25 -

The original indictments included two counts of attempted second degree murder against all of the Defendants and two counts of employing a firearm during the commission of a dangerous felony against Mr. Burgess only. The first firearm count charged Mr. Burgess with employing a firearm during the commission of an offense "as defined in T.C.A. 39-17-1324(i)(1), against the person of Demarcus Thomas." The second firearm count charged Mr. Burgess with employing a firearm during the commission of an offense "as defined in T.C.A. 39-17-1324(i)(1), against the person of Shan[n]a Niter." The superceding indictment included two counts of attempted first degree murder and two counts of employing a firearm during the commission of a dangerous felony. Neither firearm count listed the predicate felony. During trial, the trial court dismissed the second firearm count. The trial court instructed the jury that the dangerous felonies that the jury could consider were attempted first degree murder and attempted second degree murder and that the employment of a firearm charged related to count one, the charge of attempted first degree murder of Mr. Thomas.

Mr. McNary contends that because the predicate dangerous felony was not listed in the firearm charge of the indictment, the indictment for the firearm charge is missing an "essential element." Mr. McNary further contends that the failure to specify the predicate felony upon which the firearm charges were based did not comport with his constitutional right to be informed of the nature and cause of the accusation against him. The Tennessee Supreme Court, however, recently held that an indictment for a charge of employing a firearm during the commission of a dangerous felony is not missing an "essential element" of the offense when the predicate dangerous felony is not listed in the indictment. *Id.* at *9. The court further held that the failure to state the predicate felony offense "does not mean that the indictment falls below the minimum required to meet the constitutional mandate of apprising the defendant of the nature and cause of the accusation against him." *Id.*

The charges of attempted first degree murder were the only charges listed in the indictment that constituted dangerous felonies pursuant to Tennessee Code Annotated section 39-17-1324(i)(1). Like the charges in *Willie Duncan*, the charges of employing a firearm during the commission of a dangerous felony and attempted first degree murder were included in the same indictment. *See id.* at *8. Thus, it is "reasonably clear" that the firearm charges are connected to the attempted first degree murder charges, and, therefore, we may read them together for purposes of evaluating notice to Mr. McNary. *See id.* Mr. McNary was indicted for two counts of employing a firearm during the commission of a dangerous felony and two counts of attempted first degree murder. Viewing these charges together, it is clear that Mr. McNary was charged with a firearm offense for each dangerous felony of attempted first degree murder. Moreover, because the predicate dangerous felony and the firearm charge must be tried in the same trial pursuant to Tennessee Code Annotated section 39-17-1324(d), "the defendant will not be

- 26 -

surprised at having to make a defense against either of the two possible predicate felonies." *Id.* at *9. Accordingly, we conclude that the charges in the indictment of employing a firearm during the commission of a dangerous felony sufficiently apprised Mr. McNary "of the nature and cause of the accusation against him and enabled him to adequately prepare a defense to the charge." *Id.*

## III.    SUFFICIENCY

All three of the Defendants challenge the sufficiency of the evidence supporting their convictions. Mr. Jones-Cage contends that no credible proof was presented establishing that he took any direct action to harm the victims or that he was criminally responsible for the actions of those who fired on the victims. Mr. McNary maintains that the evidence established that he never fired a firearm during the shooting, that the other shooters recklessly fired shots toward the crowd and, therefore, were not guilty of attempted first degree murder, and that he was not criminally responsible for the actions of the other shooters. Mr. Burgess asserts that the evidence was insufficient to establish that he was present at the time of the offenses. The State responds that the evidence is sufficient to support the Defendants' convictions. We agree with the State.

When a defendant challenges the sufficiency of the evidence, the relevant question for this court is "whether, after viewing the evidence in the light most favorable to the State, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). On appeal, "'the State is entitled to the strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom.'" *State v. Elkins*, 102 S.W.3d 578, 581 (Tenn. 2003) (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Therefore, this court will not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Instead, it is the trier of fact, not this court, who resolves any questions concerning "the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt. *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992). The burden is then shifted to the defendant on appeal to demonstrate why the evidence is insufficient to support the conviction. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).

This court applies the same standard of review regardless of whether the conviction was predicated on direct or circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 381 (Tenn. 2011). "Circumstantial evidence alone is sufficient to support a

conviction, and the circumstantial evidence need not exclude every reasonable hypothesis except that of guilt." *State v. Wagner*, 382 S.W.3d 289, 297 (Tenn. 2012).

## A. Attempted First Degree Murder

The Defendants were convicted of attempted premeditated first degree murder of Mr. Thomas and attempted premeditated first degree murder of Ms. Niter. A person attempts to commit a criminal offense who, acting with the kind of culpability otherwise required for the criminal offense:

(1) Intentionally engaged in action or causes a result that would constitute an offense, if the circumstances surrounding the conduct were as the person believes them to be;

(2) Acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or

(3) Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

T.C.A. § 39-12-101(a).

First degree murder is the premeditated and intentional killing of another. *Id.* § 39-13-202(a)(1). A premeditated act is one "done after the exercise of reflection and judgment." *Id*. § 39-13-202(d). Premeditation requires a finding that "the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill preexist in the mind of the accused for any definite period of time." *Id*. The statute also specifies that "[t]he mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation." *Id*.

Premeditation is a question of fact for the jury's determination. *State v. Davidson*, 121 S.W.3d 600, 614 (Tenn. 2003). It may be established by any evidence which could lead a rational trier of fact to infer that premeditation was established by the proof as required by statute. *Id*. at 615. Courts frequently look to the circumstances surrounding a killing to discern the presence of evidence sufficient to support a finding of premeditation. *State v. Larkin*, 443 S.W.3d 751, 815 (Tenn. Crim. App. 2013).

Factors which tend to support the existence of premeditation include: the use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; declarations by the defendant of an intent to kill; evidence of procurement of a weapon; and preparations before the killing for concealment of the crime, and calmness immediately after the killing. *State v. Bland*, 958 S.W.2d 651, 660 (Tenn. 1997). The factors listed in *Bland* are not exhaustive, however. *State v. Adams*, 405 S.W.3d 641, 663 (Tenn. 2013). The nature of the killing or evidence establishing a motive for the killing may also support a conclusion that the crime was premeditated. *Id*. Repeated blows, although not alone sufficient to establish premeditation, may be a relevant factor in determining the existence of premeditation. *Id*. Mutilation of the body may show that a killing was not rash or impulsive. *Davidson*, 121 S.W.3d at 615. Lack of provocation by the victim, failure to render aid, and destruction or secretion of evidence may also support an inference of premeditation. *Larkin*, 443 S.W.3d at 815-16 (citing *State v. Thacker*, 164 S.W.3d 208, 222 (Tenn. 2005); *State v. Lewis*, 36 S.W.3d 88, 96 (Tenn. Crim. App. 2000)). "Under *Bland*, shooting a retreating victim alone provides circumstantial evidence of premeditation." *State v. Dickson*, 413 S.W.3d 735, 746 (Tenn. 2013).

Mr. Burgess asserts that the evidence is insufficient to establish his identity as a shooter. The identity of the perpetrator "is an essential element of any crime." *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006). Identity "may be established solely on the basis of circumstantial evidence." *State v. Lewter*, 313 S.W.3d 745, 748 (Tenn. 2010). The issue of identity is a question of fact left to the jury as the trier of fact to resolve. *State v. Crawford*, 635 S.W.2d 704, 705 (Tenn. Crim. App. 1982).

Shortly after the shooting occurred and at trial, Ms. Niter identified Mr. Burgess as the man who was sitting in the backseat on the passenger's side and shooting a large gun. Although Ms. Hervery was unable to identify Mr. Burgess in a photographic lineup following the shooting, she testified at trial that one of the shooters had a tattoo on his face. Mr. Burgess had a tattoo of a star in the area of his forehead. In contrast to his testimony at trial, Mr. Jones-Cage told the police officers that Mr. Burgess shot an assault rifle, and cartridge casings generally used in assault rifles were found throughout the scene. While Mr. Burgess maintains that he was with his grandmother at the time of the offenses, the jury chose to reject the testimony of Mr. Jones-Cage and Mr. Burgess's mother and grandmother and chose to accredit the testimony of Ms. Niter that Mr. Burgess was one of the shooters. It is within the province of the jury to resolve issues of credibility and to determine the value of the evidence presented. *See Bland*, 958 S.W.2d at 659. We conclude that the evidence, when viewed in a light most favorable to the State, is sufficient to establish Mr. Burgess's identity as a shooter.

Mr. Jones-Cage contends that no credible evidence was presented establishing that he shot a firearm during the incident. Ms. Niter and Ms. Hervery, however, both testified

that Mr. Jones-Cage was also shooting a gun during the episode. They described his position in the vehicle while he was shooting. Mr. Jones-Cage acknowledged that he had a gun permit and owned a gun. While the only cartridge casing found at the scene were shot from an assault rifle, Ms. Niter testified that Mr. Jones-Cage was shooting from the driver's seat inside the vehicle. She stated that by "the way that he was shooting[,] he could [have] shot the person [who] was sitting next to him." Although no shell casings or bullets were found inside of Mr. Jones-Cage's vehicle, he admitted to police officers that he and the other defendants hid the guns used in the shooting, and his fingerprints were not found on his own vehicle. The jury was free to accept that portion of Mr. Jones-Cage's statement and reject his statement in which he denied shooting a gun. *See State v. Ricky T. Hughes*, No. M2000-10846-CCA-R3-CD, 2002 WL 1033340, at *5 (Tenn. Crim. App. May 21, 2002) (stating that "the jury was entitled to believe part of the defendant's statements while rejecting other parts"). A jury could reasonably infer that the Defendants wiped down the vehicle and discarded all evidence of the shooting, including shell casings and bullets. Mr. Jones-Cage essentially challenges the credibility of the testimony of Ms. Niter and Ms. Harvey and the jury's decision to credit their testimony over his testimony. Because it is the province of the jury to resolve issues of credibility and determine the value of the evidence presented, we will not reevaluate issues of credibility. *See Bland*, 958 S.W.2d at 659. Rather, we conclude that when viewed in a light most favorable to the State, the evidence is sufficient to establish that Mr. Jones-Cage also shot a firearm during the episode.

The evidence is also sufficient to establish that Mr. Jones-Cage and Mr. Burgess intended to kill Mr. Thomas and Ms. Niter and took a "substantial step" toward the offenses. *See* T.C.A. § 39-12-101(a)(3). The evidence presented at trial established that the Defendants were armed and went to the area of Ms. Niter's apartment complex searching for "Little Glen." When the conversation between Mr. Jones-Cage and Ms. Niter became heated, Mr. Thomas asked Mr. Jones-Cage to leave because children and other people were outside. After Mr. Jones-Cage spoke to the others inside his vehicle and made derogatory comment about the women and children, Mr. Jones-Cage, Mr. Burgess, and Mr. Bohannon began shooting at Ms. Niter, Mr. Thomas, and the crowd of people in the area. We conclude that the acts of Mr. Jones-Cage and Mr. Burgess of carrying loaded firearms and firing them several times at the victims were corroborative of their intent to kill Mr. Thomas and Ms. Niter and that Mr. Jones-Cage and Mr. Burgess took a substantial step to complete the offenses.

The evidence also is sufficient to establish that the actions of Mr. Jones-Cage and Mr. Burgess in shooting at Mr. Thomas and Ms. Niter were premeditated. According to the evidence presented at trial, Mr. Jones-Cage and "Little Glen" had been arguing back and forth for approximately two years. After "Little Glen" made a disparaging comment about Mr. Jones-Cage in response to a Facebook post by Mr. Jones-Cage's former

girlfriend, Mr. Jones-Cage and "Little Glen" began sending each other messages in which they argued and arranged a confrontation.

The Defendants and Mr. Bohannon were armed as they were searching for "Little Glen." *See Bland*, 958 S.W.2d at 660 (recognizing evidence of procurement of a weapon as a factor supporting premeditation). Mr. Jones-Cage saw Ms. Niter and demanded that she call "Little Glen." When the conversation between Mr. Jones-Cage and Ms. Niter became heated, Mr. Thomas asked Mr. Jones-Cage to leave because children and others were outside. Mr. Jones-Cage spoke to the three men inside the vehicle and then made a derogatory comment about the women and children. Mr. Jones-Cage, Mr. Burgess, and Mr. Bohannon then began shooting at Mr. Thomas, Ms. Niter, and the crowd of people as the victims fled. None of the victims were armed nor did they provoke the Defendants. *See id.* (noting the use of a deadly weapon on an unarmed victim as a factor indicative of premeditation); *Larkin*, 443 S.W.3d at 815 (stating that lack of provocation by the victim may support an inference of premeditation). Numerous shots were fired into the crowd. Mr. Thomas sustained multiple gunshot wounds to his head, and Ms. Niter sustained a graze gunshot wound to her side.

The Defendants did not render aid to the victims and fled the scene. *See Larkin*, 443 S.W.3d at 815-16 (recognizing the failure to render aid as a factor supporting premeditation). They disposed of their guns and hid the vehicle behind an abandoned house. *See id.* (providing that the destruction or secretion of evidence may support an inference of premeditation). Mr. Jones-Cage hid in another abandoned house, while the others fled on foot. Mr. Jones-Cage avoided the police and escaped to Atlanta. We conclude that this evidence, when viewed in a light most favorable to the State, is sufficient to establish premeditation.

Mr. McNary contends that the evidence is insufficient to support his two convictions for attempted first degree murder based upon criminal responsibility. In determining whether the evidence is sufficient to sustain Mr. McNary's convictions we must consider: (1) whether Mr. McNary was criminally responsible for the acts of the other defendants; (2) whether the other defendants as the shooters intended to kill Mr. Thomas and Ms. Niter and took a "substantial step" toward the offenses for the purposes of the criminal attempt statute in Tennessee Code Annotated section 39-12-101(a)(3); and (3) whether the other defendants as the shooters acted with sufficient premeditation in their attempts to kills Mr. Thomas and Ms. Niter within the meaning of Tennessee Code Annotated section 39-13-202(a)(1). *See Dickson*, 413 S.W.3d at 744. We have determined that Mr. Jones-Cage and Mr. Burgess intended to kill Mr. Thomas and Ms. Niter, took a "substantial step" toward the offenses, and acted with premeditation. Thus, we must only determine whether Mr. McNary was criminally responsible for the acts of Mr. Jones-Cage and Mr. Burgess.

"A person is criminally responsible as a party to an offense if the offense is committed by the person's own conduct, by the conduct of another for which the person is criminally responsible, or by both." T.C.A. § 39-11-401(a). A person is criminally responsible for an offense committed by the conduct of another, if "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense[.]" *Id*. § 39-11-402(2). Although not a separate crime, criminal responsibility is a theory by which the State may alternatively establish guilt based on the conduct of another. *State v. Dorantes*, 331 S.W.3d 370, 386 (Tenn. 2001) (citing *State v. Lemacks*, 996 S.W.2d 166, 170 (Tenn. 1999)). No specific act or deed needs to be demonstrated by the State, and the presence and companionship of an accused with the offender before and after the offense are circumstances from which participation in the crime may be inferred. *State v. Ball*, 973 S.W.2d 288, 293 (Tenn. Crim. App. 1998). To be convicted, however, "the evidence must establish that the defendant in some way knowingly and voluntarily shared in the criminal intent of the crime and promoted its commission." *Dorantes*, 331 S.W.3d at 386 (citing *State v. Maxey*, 898 S.W.2d 756, 757 (Tenn. Crim. App. 1994)); *see State v. Foster*, 755 S.W.2d 846, 848 (Tenn. Crim. App. 1988)).

The evidence presented at trial established that when Mr. McNary learned that Mr. Jones-Cage planned to go to the apartment complex to search for "Little Glen," Mr. McNary refused to allow Mr. Jones-Cage to go alone. They were both armed when they went to the apartment complex, and Mr. McNary actively assisted Mr. Jones-Cage in searching for "Little Glen." Mr. McNary remained in the vehicle with the other defendants as Mr. Jones-Cage confronted Ms. Niter. Although no evidence was presented establishing that Mr. McNary fired a gun, he possessed a gun and displayed it in such a way that Ms. Niter was able to see it. After the shooting, Mr. McNary fled with the other defendants and assisted them in disposing the firearms. We conclude that this evidence, when viewed in a light most favorable to the State, is sufficient to establish that Mr. McNary knowingly and voluntarily shared in the criminal intent of the offenses and promoted their conviction. Accordingly, the evidence is sufficient to sustain Mr. McNary's convictions for attempted first degree murder based upon a theory of criminal responsibility.

## B. Aggravated Assault

The Defendants were convicted of the aggravated assault of Brittany Hervery. As it relates to this case, a defendant commits aggravated assault when he "[i]ntentionally or knowingly commits an assault … and … "[u]ses or displays a deadly weapon." T.C.A. § 39-13-102(a)(1)(A)(ii) (Supp. 2012). Assault is defined in relevant part as

"[i]ntentionally or knowingly caus[ing] another to reasonably fear imminent bodily injury." *Id*. § 39-13-101(a)(1).

The evidence presented at trial established that Mr. Jones-Cage and Mr. Burgess fired their guns into a crowd of people, causing Ms. Hervery to fear for her life. This evidence is sufficient to sustain the aggravated assault convictions of Mr. Jones-Cage and Mr. Burgess.

While Mr. McNary was holding a gun, Ms. Hervery did not testify that she saw him with a gun. Nevertheless, Mr. McNary's actions, as described above, are sufficient to show that Mr. McNary was "in some way knowingly and voluntarily shared in the criminal intent of the crime and promoted its commission." *Dorantes*, 331 S.W.3d at 386 (citing *Maxey*, 898 S.W.2d at 757). Accordingly, the evidence is sufficient to sustain Mr. McNary's conviction for aggravated assault based upon criminal responsibility.

### C. Reckless Endangerment

The Defendants were convicted of reckless endangerment of Brittany Hervery, J.N., and J.H. A person commits the offense of felony reckless endangerment "who recklessly engages in conduct that places or may place another person in imminent danger of death or serious bodily injury" and uses a deadly weapon. T.C.A. § 39-13-103(a), (b)(2). A person:

> acts recklessly with respect to circumstances surrounding the conduct or the result of the conduct when the person is aware of, but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the accused person's standpoint.

*Id.* § 39-11-106(a)(31).

The evidence presented at trial established that Mr. Jones-Cage and Mr. Burgess opened fire into a crowd of people, which included Ms. Hervery, J.N., and J.H., placing them in imminent danger of death or serious bodily injury. We conclude that the evidence is sufficient to sustain the convictions of Mr. Jones-Cage and Mr. Burgess for felony reckless endangerment. Moreover, Mr. McNary's actions, as described above, are sufficient to show that Mr. McNary "in some way knowingly and voluntarily shared in the criminal intent of the crime and promoted its commission." *Dorantes*, 331 S.W.3d at 386 (citing *Maxey*, 898 S.W.2d at 757). Accordingly, the evidence is sufficient to sustain

Mr. McNary's conviction for felony reckless endangerment based upon criminal responsibility.

## D. Firearm Convictions

Mr. Burgess was convicted of employing a firearm during the commission of a dangerous felony having been previously convicted of a felony and possessing a firearm after having been previously convicted of a felony involving the use or attempted use of violence. Mr. Jones-Cage and Mr. McNary were convicted of employing a firearm during the commission of a dangerous felony.

Tennessee Code Annotated section 39-17-1307(b)(1)(A) (Supp. 2012) prohibits the possession of firearms by a person who "[h]as been convicted of a felony, involving the use or attempted use of force, violence, or a deadly weapon." The evidence presented at trial established that Mr. Burgess was in possession of a firearm, which he shot into a crowd of people. At trial, Mr. Burgess stipulated that he had a prior felony conviction that qualified under the statute. We conclude that this evidence is sufficient to support Mr. Burgess' conviction for possession of a firearm after having been previously convicted of a felony involving the use or attempted use of force.

Employing a firearm during the commission of a dangerous felony is a Class C felony with a mandatory minimum sentence of six years in confinement. T.C.A. § 39-17-1324(b)(1), (h)(1) (Supp. 2012). The mandatory minimum sentence increases to ten years if the defendant had a prior felony conviction at the time of the offense. *Id.* § 39-17-1324(h)(2). The term "employ" means "to make use of." *State v. Fayne*, 451 S.W.3d 362, 370 (Tenn. 2014). With regard to the dangerous felonies, the trial court instructed the jury as to attempted first degree murder and attempted second degree murder, both of which constitute dangerous felonies under the statute. *See* T.C.A. § 39-17-1324(i)(1)(A), (i)(1)(B).

When viewed in a light most favorable to the State, the evidence presented at trial established that Mr. Jones-Cage and Mr. Burgess shot their firearms during the commission of attempted first degree murder. Mr. Burgess stipulated at trial that he had a prior felony conviction at the time of the shooting. The evidence is sufficient to support Mr. Jones-Cage's conviction for employing a firearm during the commission of a dangerous felony and Mr. Burgess' conviction for employing a firearm during the commission of a dangerous felony having previously been convicted of a felony.

While evidence was presented at trial that Mr. McNary possessed a gun during the offenses, no evidence was presented establishing that Mr. McNary shot or otherwise made use of his gun during the commission of attempted first degree murder. The State

contends that the evidence is sufficient to support Mr. McNary's conviction under a theory of criminal responsibility. However, the trial court did not instruct the jury on criminal responsibility with regard to the firearm charges. Because the evidence established that Mr. McNary possessed a firearm but did not employ the firearm, we conclude that the evidence is insufficient to support Mr. McNary's conviction for employing a firearm during the commission of a dangerous felony. We reverse the conviction and remand the matter for a new trial on the charge of possession of a firearm during the commission of a dangerous felony as a lesser-included offense. *See Fayne*, 451 S.W.3d at 370 (holding that possession of a firearm during the commission of a dangerous felony is a lesser-included offense of employment of a firearm during the commission of a dangerous felony).

## IV. IMPEACHMENT TESTIMONY

Mr. Burgess contends that the trial court committed plain error in not allowing defense counsel to impeach Ms. Niter's testimony at trial with her statement to the police. Mr. Burgess did not raise this claim as a separate issue in his brief but argued it as a collateral issue when addressing the sufficiency of the evidence. His entire argument in his brief appears as follows:

> Further, Appellant will argue later that due to the court prevented [sic] a full and proper impeachment of the witness Shan[n]a Niter. At trial, counsel for Appellant attempted to impeach the witness Niter with a previously inconsistent statement (v.7, pg. 99-104). The trial court did not allow counsel for Appellant to admit this information. (v.7, pg. 102) Appellant argues that this was plain error and should invalidate the conviction.

Mr. Burgess did not "argue [the issue] later" or otherwise mention the issue in the remainder of his brief. He provided no analysis and cited to no authority to support his claim. Accordingly, this issue is waived. *See* Tenn. R. App. P. 27(a)(7)(A); Tenn. Ct. Crim. App. R. 10(b).

## V. DENIAL OF MISTRIAL

Mr. Burgess maintains that the trial court erred in denying defense counsel's motion for a mistrial after the court reporter's equipment malfunctioned at trial. As a result of the malfunction, the cross-examination of Ms. Niter by counsel for Mr. Jones-Cage and a portion of the cross-examination of Ms. Niter by counsel for Mr. McNary were not recorded. After Ms. Niter's testimony concluded, trial court informed the parties of the malfunction. Mr. Jones-Cage and Mr. Burgess requested a mistrial. In the

alternative, counsel for Mr. Jones-Cage requested that she be allowed to recross-examine Ms. Niter in front of the jury.

In denying the motions, the trial court noted that no objections or evidentiary issues were raised during the unrecorded proceedings. As a result, the trial court found no reason for the defense to recross-examine Ms. Niter. The trial court also found that Tennessee Rule of Appellate Procedure 24 provided a remedy in the event that a verbatim recording was unavailable for appellate purposes.

A trial judge should declare a mistrial if manifest necessity arises. *Arnold v. State*, 563 S.W.2d 792, 794 (Tenn. Crim. App. 1977). Manifest necessity occurs when "no feasible alternative to halting the proceedings" exists. *State v. Knight*, 616 S.W.2d 593, 596 (Tenn. 1981). "The granting or denial of a mistrial is within the sound discretion of the trial court." *State v. McKinney*, 929 S.W.2d 404, 405 (Tenn. Crim. App. 1996); *see State v. Jones*, 802 S.W.2d 221, 222 (Tenn. Crim. App. 1990). This court will only disturb that decision if the trial court abused its discretion. *State v. Adkins*, 786 S.W.2d 642, 644 (Tenn. 1990).

The record reflects that the recording equipment malfunctioned for approximately one hour during the course of the multi-day trial. There is nothing in the record indicating to what Ms. Niter testified during this unrecorded period. As recognized by the trial court, Tennessee Rule of Appellate Procedure 24(c) provides for a procedure whereby an appellant may submit a statement of the evidence when a transcript is unavailable. Mr. Burgess did not seek to submit a statement of the evidence of the unrecorded portions of the trial in accordance with Rule 24(c) or otherwise demonstrate that a statement of the evidence could not be accurately compiled. We conclude that the trial court did not abuse its discretion in denying the motion for a mistrial.

## VI. SENTENCING

Mr. Burgess and Mr. McNary contend that the trial court erred in imposing consecutive sentences. The State maintains that the trial court acted within its discretion in finding that Mr. Burgess and Mr. McNary were dangerous offenders and ordering consecutive sentences. We agree with the State.[4]

---

[4] Although we have reversed Mr. McNary's conviction for employing a firearm during the commission of a dangerous felony and remanded the case for a new trial, we review the trial court's imposition of Mr. McNary's sentence as it relates to that conviction in case of further appellate review.

In imposing consecutive sentences, the trial court found that the Defendants were dangerous offenders whose behavior indicated little or no regard for human life. The trial court also found that consecutive sentencing was necessary to adequately punish the Defendant's criminal behavior. The trial court reasoned that the Defendants

> [h]ad no hesitation in committing a crime when the risk was high and all three of the following apply, circumstances surrounding the offense are aggravated, confinement for an extended period of time is absolutely necessary to protect society from the defendant's unwillingness to lead a productive life, and the aggregate length of the sentences reasonably relates to the offense.

The trial court stated that if it were to run the sentences for the two convictions for attempted first degree murder concurrently, it "would be sending the message that if you're going to be mad at one person you might as well shoot everybody around them because you can't get any more time because it will just all be run concurrent."

The trial court ordered that the Defendants' sentences for the two attempted first degree murder convictions run consecutive to each other and to the conviction for employing a firearm during the commission of a dangerous felony. The trial court noted that consecutive sentencing for the firearm convictions was mandated by statute. The trial court ordered that the sentences for the remaining convictions be served concurrently to each other.

The trial court sentenced Mr. Burgess to twenty-five years for the attempted first degree murder of Mr. Thomas, twenty years for the attempted first degree murder of Ms. Niter, ten years for employing a firearm during the commission of a dangerous felony, three years for being a convicted felon in possession of a firearm, three years for aggravated assault, and one year for reckless endangerment. The trial court ordered that the sentences for attempted first degree murder run consecutive to each other and to the sentence for employing a firearm during the commission of a dangerous felony and concurrent to the sentences for the remaining convictions, resulting in an effective sentence of fifty-five years.

The trial court sentenced Mr. McNary to twenty years for the attempted first degree murder of Mr. Thomas, fifteen years for the attempted first degree murder of Ms. Niter, six years for employing a firearm during the commission of a dangerous felony, three years for aggravated assault, and one year for reckless endangerment. The trial court ordered that the sentences for attempted first degree murder run consecutive to each other and to the sentence for employing a firearm during the commission of a dangerous

felony and concurrent to the sentences for the remaining convictions, resulting in an effective sentence of forty-one years.

A trial court's sentencing decisions are generally reviewed for abuse of discretion, with a presumption of reasonableness granted to within-range sentences that reflect a proper application of the purposes and principles of sentencing. *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). Likewise, the "standard of appellate review for consecutive sentencing is abuse of discretion accompanied by a presumption of reasonableness." *State v. Pollard*, 432 S.W.3d 851, 859 (Tenn. 2013). The presumption of reasonableness applies only when the trial court has provided reasons on the record establishing at least one of the seven statutory bases for imposing consecutive sentences delineated in Tennessee Code Annotated section 40-35-115(b). *Id.* at 861.

Tennessee Code Annotated section 40-35-115(b) allows a court to impose consecutive sentences when "[t]he defendant is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high." T.C.A. § 40-35-115(b)(4). When the trial court bases its decision to run sentences consecutively on the dangerous offender category in Tennessee Code Annotated section 40-35-115(b)(4), it must make additional findings as set out in *State v. Wilkerson*: that the aggregate sentence is "'reasonably related to the severity of the offenses'" and "'necessary in order to protect the public from further criminal acts.'" *Pollard*, 432 S.W.3d at 863 (quoting *State v. Wilkerson*, 905 S.W.2d 933, 938 (Tenn. 1995)). If the trial court fails to make the requisite findings, the appellate court may either conduct a de novo review to determine whether there is an adequate basis for the imposition of consecutive sentences or remand to the trial court so that it may consider the appropriate factors and make the proper findings. *Id.* at 864.

The convictions for employing a firearm during the commission of a dangerous felony must run consecutively to the underlying dangerous felony by law. *See* T.C.A. § 39-17-1324(e)(1) ("A sentence imposed for a violation of subsection (a) or (b) shall be served consecutive to any other sentence the person … is sentenced to serve for conviction of the underlying dangerous felony."). The trial court instructed the jury that the predicate dangerous felonies were attempted first degree murder and attempted second degree murder and that the firearm charge related to count one, which was the charge of attempted first degree murder of Mr. Thomas. Accordingly, Mr. Burgess' ten-year sentence and Mr. McNary's six-year sentence for employing a firearm during the commission of a dangerous felony must run consecutive to their sentences for the attempted first degree murder of Mr. Thomas.

In imposing further consecutive sentencing, the trial court found that Mr. McNary and Mr. Burgess were dangerous offenders whose behavior indicated little to no regard

for human life and that they had no hesitation about committing the offenses in which the risk to human life was high. In imposing partial consecutive sentences, the trial court found that the aggregate sentences were reasonably related to the severity of the offenses and that the sentences were necessary to protect the public from further criminal acts by Mr. Burgess and Mr. McNary. The trial court made the requisite findings under Tennessee Code Annotated section 40-35-115(b)(4) and *Wilkerson*, and we accordingly grant the trial court's findings a presumption of reasonableness. *See Pollard*, 432 S.W.3d at 863 (quoting *Wilkerson*, 905 S.W.2d at 938). The trial court properly considered the purposes and principles of sentencing during the hearing, and it imposed partial consecutive sentences after finding that the statutory requirements were met. There is nothing in the record to show that the trial court abused its discretion.

## VII.   CUMULATIVE ERROR

Mr. Burgess asserts that he is entitled to a new trial based upon cumulative error. He has failed to establish that any error occurred during the trial or that he is entitled to a new trial as a result. Mr. Burgess is not entitled to relief regarding this issue.

## VIII.   CORAM NOBIS PETITION

After the final judgments were entered and the Defendants filed their notices of appeal, Mr. Burgess filed a pro se petition for writ of error coram nobis on October 9, 2015. Mr. Burgess attached an affidavit from Mr. Jones-Cage dated February 4, 2015, which Mr. Burgess claimed constituted newly discovered evidence of his innocence.

In the affidavit, Mr. Jones-Cage denied that Mr. Burgess was involved in the shooting. Mr. Jones-Cage stated he, Mr. McNary, and Mr. Bohannon went to the apartment complex to search for "Little Glen." Mr. Jones-Cage stated that he shot the victim in the face with a "357" following an argument and that as they were leaving, Mr. Bohannon shot up the apartment complex with an "AK47." Mr. Jones-Cage claimed that the victim "upped a gun" and that "things got out of hand." According to Mr. Jones-Cage, he implicated Mr. Burgess, Mr. McNary, and Mr. Bohannon because they took his studio equipment after Mr. Jones-Cage fled to Atlanta. Mr. Jones-Cage said he contacted Ms. Niter, told her that Mr. Burgess and the other men were involved, and provided her with information regarding Mr. Burgess' tattoo.

The trial court entered an order denying Mr. Burgess' petition without a hearing. The trial court found that Mr. Jones-Cage testified to the information contained in the affidavit at trial and that as a result, the information did not constitute "newly discovered" evidence.

- 39 -

A writ of error coram nobis is an "extraordinary procedural remedy," filling only a "slight gap into which few cases fall." *State v. Mixon*, 983 S.W.2d 661, 672 (Tenn. 1999) (citation omitted). Tennessee Code Annotated section 40-26-105(b) provides that coram nobis relief is available in criminal cases as follows:

> The relief obtainable by this proceeding shall be confined to errors dehors the record and to matters that were not or could not have been litigated on the trial of the case, on a motion for a new trial, on appeal in the nature of a writ of error, on writ of error, or in a habeas corpus proceeding. Upon a showing by the defendant that the defendant was without fault in failing to present certain evidence at the proper time, a writ of error coram nobis will lie for subsequently or newly discovered evidence relating to matters which were litigated at the trial if the judge determines that such evidence may have resulted in a different judgment, had it been presented at the trial.

Our supreme court has stated the standard of review as "whether a reasonable basis exists for concluding that had the evidence been presented at trial, the result of the proceedings might have been different." *State v. Vasques*, 221 S.W.3d 514, 527 (Tenn. 2007) (citation omitted).

Coram nobis claims may be based upon any "newly discovered evidence relating to matters litigated at the trial" so long as the petitioner establishes that he or she was "without fault" in failing to present the evidence at the proper time. *Harris v. State*, 102 S.W.3d 587, 592 (Tenn. 2003) (quoting T.C.A. § 40-26-105(b)). Coram nobis claims are "singularly fact-intensive," are not easily resolved on the face of the petition, and often require a hearing. *Id.* at 593. The decision to grant or deny coram nobis relief rests within the sound discretion of the trial court. *Vasques*, 221 S.W.3d at 527-28.

A petition for the writ of error coram nobis must relate: (1) the grounds and the nature of the newly discovered evidence; (2) why the admissibility of the newly discovered evidence may have resulted in a different judgment had the evidence been admitted at the previous trial; (3) that the petitioner was without fault in failing to present the newly discovered evidence at the appropriate time; and (4) the relief sought by the petitioner. *Freshwater v. State*, 160 S.W.3d 548, 553 (Tenn. Crim. App. 2004). Newly discovered evidence is evidence that was unknown to the defendant at the time of the proceedings that are the subject of the coram nobis claim. *Wlodarz v. State*, 361 S.W.3d 490, 506 (Tenn. 2012) *abrogated on other grounds by Frazier v. State*, 495 S.W.3d 246, 248 (Tenn. 2016). Courts have held repeatedly that a coram nobis court is not required to hold an evidentiary hearing when a petition for the writ of error coram nobis fails to meet the necessary prerequisites for granting relief. *Cole v. State*, 589 S.W.2d 941, 941-43 (Tenn. Crim. App. 1979).

In the affidavit, Mr. Jones-Cage stated for the first time that he shot Mr. Thomas in the face and that Mr. Bohannon shot up the apartment complex. However, Mr. Jones-Cage testified at trial that Mr. Burgess was not involved in the shootings and that he implicated Mr. Burgess after Mr. Burgess stole several items from him. Likewise, Mr. Jones-Cage similarly stated in his affidavit that Mr. Burgess was not involved and that Mr. Jones-Cage only implicated him after Mr. Burgess took several items from him. The jury rejected Mr. Jones-Cage's testimony and convicted Mr. Burgess of the offenses. Mr. Burgess has failed to establish that a different judgment may have resulted had the information in Mr. Jones-Cage's affidavit been presented at trial. We conclude that the trial court did not abuse its discretion in denying Mr. Burgess' petition for writ of error coram nobis without a hearing.

**CONCLUSION**

Based on the foregoing, we reverse Mr. McNary's conviction for employing a firearm during the commission of a dangerous felony and remand the case for a new trial on possession of a firearm during the commission of a dangerous felony as a lesser-included offense. We note that with regard to Mr. Jones-Cage's judgments of conviction, count one fails to reflect the convicted offense of attempted first degree murder and count three, the conviction of employment of a firearm during the commission of a dangerous felony, fails to reflect service of the sentence at 100 percent. Accordingly, we remand for entry of corrected judgments as to counts one and three of Mr. Jones-Cage's convictions. We otherwise affirm the judgments of the trial court.

_____
JOHN EVERETT WILLIAMS, JUDGE